IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| REBECCA T.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 22 C 4827 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff filed her application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§416(i), 423, over two and a half years ago in August of 2020. (Administrative Record (R.) 242-43). She claimed that she had been disabled since June 22, 2019 (R. 242) due to: "rheu[matoi]d arithriti[s], migrainies, fibromyalgia, sjogren syndrome, pre gl[au]coma, ost[eo]arth[ritis], chondrocalcinosis, morphey, carpel tunnel, inability to find words." (R. 265). Over the next two years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on September 8, 2022, and the parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on September 13, 2022. [Dkt. ##7, 8]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an Order affirming

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only her first name and the first initial of her last name.

the decision.

## I.

### A.

Plaintiff was born on June 21, 1970 (R. 242), making her 49 years old when she claims she became unable to work, and 51 when the ALJ found she was not disabled. Plaintiff, who is an accountant, has a stellar work history, working steadily from 1987 through 2019. (R. 250-52). Over the years, her rheumatoid arthritis and osteoarthritis became progressively worse until she was unable to sit and work for more than an hour. (R. 45-46). It affected her whole body – neck, back, hips, knees, hands. (R. 45-46, 54, 59-60, 63). She has pain from her neck to her fingers when typing. (R. 59-60, 65-66). She also began having frequent migraines, perhaps 12 to 15 a month. Her conditions interfered with her concentration and memory. She sometimes had difficulty thinking of the right words and she struggled with what ought to have been simple accounting tasks. (R. 45-46, 56-58). She takes medication and has injections once a month for her migraines and pain. (R. 49). Her insurance company limited the amount of physical therapy she could have. (R. 59-60). She's had carpal tunnel surgery and foot surgery. (R. 58-59, 64). She's had one knee replaced, and has to get the other replaced. (R. 54). At the time of her administrative hearing in October 2021, she was even having trouble with her knee replacement. (R. 55).

### B.

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: "degenerative joint disease of the right ankle; rheumatoid arthritis; degenerative joint disease of the bilateral knees; bilateral trochanteric bursitis; degenerative disc disease of the lumbar spine;

2

migraines; and carpal tunnel syndrome." (R. 15-16). The ALJ said the plaintiff's medically determinable mental impairment of neurocognitive disorder caused no more than mild limitations and was, therefore, nonsevere, and that plaintiff's fibromyalgia was not a medically determinable impairment. (R. 16). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ specifically considered the requirements for the Listings 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root), 1.18 (abnormality of a major joint in any extremity), and 11.00 (migraine headaches).

      The ALJ then determined that the plaintiff had the residual functional capacity ("RFC") to sedentary work with a number of additional limitations:

> except frequent bilateral handling, fingering and feeling; never climb ladders, ropes or scaffolds, kneel or crawl; occasionally climb ramps or stairs, balance, stoop or crouch; occasionally push or pull with the bilateral lower extremities; and avoid hazards of unprotected heights and dangerous moving machinery.

(R. 18). Next, the ALJ summarized the plaintiff's complaints. The plaintiff testified that she stopped working at an accounting firm in July 2019 because her rheumatoid and osteoarthritis got so bad that she could not sit for any amount of time. She said she got shooting pain and numbness down her face, arms and legs. At the same time, her migraines worsened, and she began having 12-15 per month. She missed a lot of work as a result. Her condition adversely affected her memory and concentration. Plaintiff also testified that, while she had carpal tunnel surgery back in 1992, her hands have gotten progressively worsened. She is unable to open a jar, has trouble holding a pencil, and using a computer keyboard is painful. (R. 19). The ALJ then found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms;

3

however, the [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 39).

The ALJ then reviewed the medical evidence, noting that the plaintiff had an array of difficulties and a mosaic of treatment. She has had two right ankle surgeries for peroneal tendinitis in December 2018 and October 2019. She had a knee replacement in June 2021. She has hip pain due to rheumatoid arthritis, but the ALJ felt treatment for that was conservative. She has carpal tunnel syndrome, but the ALJ noted that in May 2021 "her hands were not significantly problematic." The ALJ further noted that the plaintiff had a "remote history of lumbar surgery for degenerative disc disease, narrowing of disc spaces L4-5 and L5-S1, mild dextroscoliosis and degenerative disc disease of the thoracic spine and moderate degenerative disc disease at C5-C6 and C6-C7, but no regular or ongoing treatment for degenerative disc disease of the cervical, lumbar or thoracic spine. The ALJ added that while records indicated reports of "[w]orsening migraine symptoms," they improved with medication. (R. 19).

The ALJ went on to note the April 2019 exam revealed moderate loss of range of motion of the lumbar spine; full range of motion of the cervical spine, without pain; patellar crepitus; and knee pain with passive tracking. There were enlarged PIPs and DIPs, but no synovitis or tenosynovitis in the hands and normal range of motion of the wrists, with no swelling, pain or tenderness. Medication included Leflunomide, Sulfasalazine, and Tramadol. (R. 20). The ALJ then noted plaintiff underwent right foot/ankle surgeries for peroneal tendinitis in December 2018 and October 2019. The ALJ then related that plaintiff was non-weightbearing during December 2019, and that plaintiff's pain in her joints was worse. As of January 2020 plaintiff was weightbearing in a CAM

boot. As of March 3, 2020, plaintiff's gait was normal. But, by September 2020, X-rays showed bone on bone rheumatoid arthritis in both knees and a left knee replacement was recommended. (R. 20). Through October 2020 plaintiff received just 20 percent relief from knee injections, and exam revealed patellar crepitus and pain with passive tracking, moderate loss of lumbar range of motion, and tender left thumb IP; but also normal range of motion of the wrists without pain, swelling or tenderness, and normal passive range of motion of the hips, without pain. (R. 21)

The ALJ moved on to plaintiff's consultative exam results from November 2020. There was tenderness in the hands and knees. Grip strength was reduced to 3/5, sensation to pin prick in the hands was decreased. Plaintiff walked with a limp. Range of motion in all joints was normal, strength was 5/5 in the upper limbs and 4/5 in the lower limbs. (R. 21). The ALJ next noted that plaintiff was diagnosed with fibromyalgia in March 2021, but said it was not supported by objective findings. There was, again, patellar crepitus and pain with passive tracking, moderate loss of lumbar range of motion and tender SI areas, and left thumb tenderness; but no tenderness over the trochanteric bursa, but normal wrist range of motion without pain, swelling, and normal strength and sensation. (R. 22). At an orthopedic exam in June 2021, plaintiff's gait was antalgic and favored the left lower extremity. On June 23, 2021, total left knee arthroplasty was performed and after eleven physical therapy sessions, plaintiff was still unable to ambulate independently. (R. 21).

From there, the ALJ moved on to plaintiff's migraines and her neck. Reports went from six migraines a month in April 2019, to "infrequent migraines" in May 2019, to "bad" migraines about once or twice per year in June 2019, to "high frequency" migraines in September and November of 2019. Medication seemed to cause "word finding problems" and was finally adjusted in February 2020 and plaintiff's memory got a little better. Migraines increased in April and July of 2020, and

5

neck pain was another concern. An August 13, 2020 MRI of the cervical spine revealed moderate degenerative disc disease at C5-C6 and C6-C7. As of May 2021, plaintiff was having 10-12 migraines a month. (R. 22).

As for medical opinions, The ALJ noted that the initial state agency reviewing doctor could perform light work except for occasional climbing; occasional handling and feeling with the bilateral upper extremities (due to carpal tunnel syndrome); and avoiding concentrated exposure to hazards. The reconsideration reviewing doctor reduced plaintiff's capacity to sedentary work, limiting her to just two hours of standing, never climbing ladders, ropes or scaffolds, and only occasional fine manipulation/fingering, in addition to prior handling, feeling and environmental limitations. At that point, the state agency had one more doctor take a look, and this final reviewer disagreed with the other two, finding that plaintiff had the ability to handle and finger frequently, with no limitation in feeling. The ALJ went with the third doctor, saying it was more consistent with the hearing level evidence. (R. 23). Next, the ALJ accepted the recommendation from plaintiff's knee surgeon that she avoid high impact activities, finding this was consistent with the overall record. The ALJ similarly accepted the opinion from plaintiff's ankle surgeon that she could return to regular duties. Finally, the ALJ accepted the mild limitations on memory and concentration found by state agency reviewing psychologist. (R. 23).

The ALJ then relied on the testimony of the vocational expert that someone with the plaintiff's residual functional capacity could perform plaintiff's past work as an accountant. (R. 24). Accordingly, the ALJ determined that the plaintiff was not disabled and not entitled to disability insurance benefits under the Act. (R. 25).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The "substantial evidence" standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Milhem v. Kijakazi*, 52 F.4th 688, 694 (7th Cir. 2022); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). To determine whether "substantial evidence" exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The Seventh Circuit has explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in

7

his or her obligation to build that "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash.[2] But, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*,

---

[2] By way of example, in the Seventh Circuit's recent ruling in *Jarnutowski*, 48 F.4th 769, two judges on the panel felt the ALJ had not adequately explained aspects of her reasoning while a third judge, dissenting, thought she did. The Magistrate Judge who reviewed the ALJ's decision at the district court level also felt the ALJ had adequately explained her reasoning. *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1, 2021).

516 F.3d 539, 545 (7th Cir. 2008). All ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).[3] As it happens, this case presents one of those sketchy opinions that fails to provide the court with enough of a "logical bridge" to get from the evidence to the conclusion.

---

[3] Prior to *Sarchet's* "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).
> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do....This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Stephens*, 766 F.2d at 287 (citations omitted). Much more recently, the Seventh Circuit explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

9

**III.**

The plaintiff advances two arguments for overturning the ALJ's decision. First, she contends that "[t]he ALJ's finding that [she] would be able to frequently use her bilateral hands is unsupported by substantial evidence." [Dkt. #12, at 8-10]. Second, she complains that "[a]fter determining [her] mental impairment is non-severe, the ALJ failed to factor in the effects of all [her] impairments, including chronic widespread joint pain and chronic migraines, on her ability to sustain full-time competitive work at any exertional level." [Dkt. #12, at 11-15]. Because the first issue warrants a remand of this case, we shall confine analysis to that problem.

The main issue in this case is the difference between occasional fingering and handing – which means up to one third of the workday – and frequent fingering and handling – between one third and two thirds of the workday. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008); SSR 83-10, 1983 WL 31251, *5-6 (Jan. 1, 1983). It's significant because if plaintiff is limited to just occasional handling and fingering, she arguably cannot do her past relevant work (R. 68-69)[4] and that would scuttle the ALJ's decision. As it happens, there are a handful of medical opinions about how much the plaintiff can use her hands, from three different state agency reviewing physicians.

In the initial agency review, on November 23, 2020, Dr. Ranga Reddy found that plaintiff could perform light work but "should be limited to occasional handling and feeling with the BUE due to bilateral CTS." (R. 89). While that ruled out plaintiff's past work, there were other jobs plaintiff could perform so the plaintiff was deemed not disabled. (R. 91-92). On reconsideration, on March 24, 2021, Dr. Charles Kenney reduced plaintiff's capacity to sedentary work, but agreed

---

[4] The vocational expert parted company with the Dictionary of Occupational Titles ("DOT") on this point, as the DOT says an accountant position requires only occasional fingering and handling. (R. 68-69).

10

that plaintiff was restricted to occasional fine and gross manipulations due to carpal tunnel syndrome, and that she was unable to perform her past relevant work. (R. 117). The medical evidence he cited to support this was "12/31/19 PE shoulder full ROM, no tenderness, no effusion, wrist normal ROM, hands L thumb is tender . . . 11/10/20 PE . . . tenderness of hands . . . ROM all WNL, moderate issues with squeezing BP bulb bilat grips 3/5, sensation decreased of the hands, BLE strength 4/5, reflexes WNL." (R. 114). Dr. Kenney parted company with the initial review and concluded that plaintiff was disabled due to "a substantial loss of ability to meet an of the basic work related activities." (R. 118). Dr. Kimberly Terry signed off on Dr. Kenny's findings on April 8, 2021. (R. 119).

Things get bureaucratically murky at that point in the proceedings. Dr. Terry apparently had another go at it on that same day – April 8, 2021 (R. 132) – and, this time, she recommended "freq bilat handling and fingering and no limits in feeling." (R. 132). Her rationale was: "NO evidence of current carpal tunnel signs or symptoms. 8/2019 exam described enlarged PIP and DIP jts but then stated MCPs are tender. More recent Rheum fu notes only describe R IP jt tenderness. CE 11/2020 nl rom hands and wrists, no gross abnls described. Decr ability to squeeze bulb w 3/5 bilat grip strength and nl hand dexterity. NO sensory abnls." (R. 132). From there, it looks like the file went back to Dr. Kenny, who adopted Dr. Terry's findings on April 20, 2021 (R. 140-42) and flipped the script one more time to find plaintiff not disabled, because, with frequent fingering and handling, she could go back to her accounting work. (R. 142-43).

When that mess made it to the ALJ, here's what she made of it:

> State agency medical consultant Kimberlee Terry, MD, opined that the claimant has the ability to handle and finger frequently, with no limitation in feeling. Dr. Terry otherwise agreed with the reconsideration level medical findings. (12E; 19F). Dr.

11

Terry's opinion is persuasive because it is consistent with the more recent rheumatology exams observing only left thumb tenderness. (15F; 17F; 20F). Dr. Reddy's initial level opinion is not persuasive because the claimant's knee and other impairments support standing/walking limitation consistent with sedentary. The reconsideration level opinion of Dr. Kenny is generally persuasive, except for manipulative limits, which are better supported by Dr. Terry and more consistent with the hearing level evidence.

(R. 23). The ALJ apparently missed Dr. Terry's initial agreement with Dr. Kenny that plaintiff was limited to occasional fingering and handling (R. 118-19), and missed Dr. Kenny's flip-flop to agree with Dr. Terry's flip-flop to find plaintiff was instead able to perform frequent fingering and handling. (R. 140-43). Instead, the ALJ looked at two other forms. One was a form called "Request for Corrective Action" dated April 12, 2021, that looks as though it was prepared by a "P.Maninang, Jr." and initialed by a "DG." Neither seem to be physicians. (R. 353-54).[5] The other was a document buried at the bottom of the administrative record; a checklist seemingly filled out by Dr. Terry on March 24, 2021 – a couple of weeks before Dr. Terry signed Dr. Kenny's review – which indicates that the plaintiff could perform "Freq bilat fingering and handling. NO limits in feeling. See 416." (R. 1078). While the form the ALJ thinks Dr. Terry filled out instructed Dr. Terry to "explain how and why the evidence supports these conclusions," she did not do so. (R. 1078).

So, there's no explanation for what went on back in those initial and reconsideration stages of review. It's not clear *what* prompted Dr. Terry to do a one-eighty. The "Request for Corrective Action" came *after* she changed her mind. It's not even clear *when* Dr. Terry did her one-eighty. It seems she signed off on Dr. Kenny's finding that plaintiff was limited to occasional fingering and

---

[5] This calls to mind a similar situation that vexed the Seventh Circuit in *Terry v. Astrue*, 580 F.3d 471, 476 (7th Cir. 2009)("There is nothing in the record itself that suggests the report is authored by a physician at all, let alone the specific doctor proposed by the government.").

handling and was disabled on April 8, 2021 (R. 118-19), but the form the ALJ relied on for Dr. Terry's purported finding is dated March 24, 2021. (R.1078). And, then again, we have Dr. Terry signing another April 8, 2021 review saying plaintiff was able to do frequent handling and fingering and was not disabled. (R. 132). Who knows why the state agency physicians went from "not disabled", to "disabled", and back to "not disabled"? There was certainly no explanation from the ALJ. At this point, it's worth remembering that the "logical bridge" requirement exists to facilitate a meaningful judicial review. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014); *Getch v. Astrue*, 539 F.3d 473, 481 (7th Cir. 2008). One can't make heads or tails of what went on in the administrative review here or why a set of doctors thinks the same medical evidence supports a restriction to occasional fingering and handling one day, but supports a capacity for frequent fingering and handling another day.

In any event, the ALJ hinged everything on that cryptic checklist from Dr. Terry as being "consistent with the more recent rheumatology exams observing only left thumb tenderness." That's not what Dr. Terry said; she said more recent rheumatology follow-up notes "only describe *R[ight]* IP j[oin]t tenderness . . . ." (R. 132). That could just be a typo on Dr. Terry's part – or on the ALJ's part. Ordinarily, the court might see its way through to figuring out who meant what. But not in a case like this where so much is left unexplained. Moreover, unlike the ALJ, Dr. Terry didn't confine plaintiff's joint tenderness to the thumb. There are IP joints on every finger. If all those joints are tender on the right hand, that's going to make it very difficult to handle and finger for two thirds of every day.

While we are at it, what is meant by "more recent" rheumatology exams? Dr. Terry seemed to mean more recent than August of 2019, when plaintiff's PIP and DIP joints were enlarged and her

13

metacarpal joints were tender. (R. 132). But, as plaintiff points out, the doctor only cited a November 2020 consultative exam. (R. 132). The ALJ cited to those "more recent rheumatology exams," but not in any helpful fashion. She pointed to a block of fourteen pages, a block of one-hundred and eighty-five pages, and a block of four-hundred and thirty-six pages. (R. 23 (citing 15F; 17F; 20F)). That *certainly* does not facilitate meaningful review. The court is not obliged to thumb through six-hundred and thirty-five pages of medical evidence to find the unspecified records that might have caught the ALJ's fancy. *See, e.g., Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014)("This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence . . . . Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination."); *Anthony G. v. Kijakazi*, No. 20-CV-7686, 2022 WL 2237133, at *2 (N.D. Ill. June 22, 2022)("In this case, the Court is left to sift through a pile of evidence and a pile of conclusions and tasked with intuiting which evidence grafts onto which conclusion. As such, the ALJ has failed to build an accurate and logical bridge . . . ."); *Fadil v. Saul*, No. 1:19-CV-326-PPS, 2020 WL 1466428, at *3 (N.D. Ind. Mar. 26, 2020)("It is not the Court's job to dig through the medical record to find the evidence that supports the ALJ's assertions."); *Jennifer R. v. Berryhill*, No. 17-CV-9114, 2019 WL 1595885, at *3 (N.D. Ill. Apr. 15, 2019)("Nor should this Court have to sift through the record looking for clues as to how the ALJ [reached her] determin[ation] . . . ."). The ALJ didn't build any bridge at all here. She simply dumped a pile of medical records in the court's lap and expected the court to do the rest.

It's worth pointing out that nearly half of the evidence the ALJ cited as being more recent that August 2019 is not; it's dated from August 2019 *or before*. (R. 925-1058, 1252-1407, 1468-1516).

14

So, the ALJ is directing the court to evidence that has nothing to do with her finding. Okay, let's say there is a court willing to do some of the ALJ's work for her, go through the more than six hundred pages, and separate them by date; remember, because this is an administrative record in a Social Security Disability case, the evidence is not arranged in chronological order. But, let's say the court goes through all that for the ALJ and separates the pile of post-August 2019evidence from the pile of pre-August 2019 evidence. Which of the reports from after August 2019 is the court supposed to single out for the ALJ to support her finding that plaintiff could handle and finger for two-thirds of the workday, five days a week; in other words, go back to typing at a computer most of every day?

It's a good question because plenty of those reports seem to depict a woman who is not going to be able to sit hunched over a laptop typing away and doing tax calculations all day, every day. On December 31, 2019, plaintiff was suffering achy, dull joint pain in hands, made worse with activity. (R. 905-06). On May 12, 2020, plaintiff was suffering pain and swelling in her hands, and pain in her wrist and neck (R. 856). An August 13, 2020 MRI of the cervical spine revealed moderate degenerative disc disease at C5-C6 and C6-C7, with disc bulges causing moderate left neural foraminal narrowing and severe right neural foraminal narrowing at C5-6, and severe left neural foraminal narrowing and mild right neural foraminal narrowing at C6-7. (R. 1663-64). On August 26, 2020, plaintiff had neck pain radiating down her arms and sometime numbing in her hands, along with limited range of motion in her cervical spine and decreased strength in her arms. (R. 1656). So, at least some of the post-August 2019 evidence shows, not only that plaintiff suffers from carpal tunnel syndrome, but also that she has moderate to severe neural foraminal due to disc bulges in her neck that seems to be causing another layer of issues with her arms and hands. In short, this is why an ALJ can't just cite to a block of six hundred pages of evidence and call it a day. She has to

15

*identify* which evidence among those pages leads to her conclusion. *Albert*, 34 F.4th at 614; *Moon*, 763 F.3d at 721; *see also Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011)("The ALJ needed to explain how she reached her conclusions about [plaintiff's] physical capabilities . . . but the primary piece of evidence that she relied on does not support the propositions for which it is cited.").

## CONCLUSION

The plaintiff's motion for summary judgment [Dkt. #12] is granted, and this case is remanded to the Commissioner.

**ENTERED:** _____
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 5/2/23